

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable W. Lee O'Daniel
Governor of Texas
Austin, Texas

Dear Sir:

Opinion No. O-1256
Re: Refund of Service Charges
on services rendered by
State owned Jacks and
Stallions.

We have your letter of August 4, wherein you request the opinion of this department on the following questions:

1. Does the law authorize the Commissioner of Agriculture to refund payment of service charges on services rendered up to January 1, 1938, by State owned jacks and stallions?

2. Is it lawful for the payment of such refunds to be made from the General Fund instead of from the Special Racing Fund, Jack and Stallion Division?

It is not possible to give a categorical answer to either of your questions. In order to advise you generally with regard to the right to refunds of the service charges on services rendered by State owned jacks and stallions, it is necessary briefly to review the history of the Acts authorizing such refunds.

House Bill No. 779, Acts of the Forty-fourth Legislature, provides, in part, as follows:

"Providing the Commissioner of Agriculture is hereby authorized to make refunds of such service charges, when the animal served has not been foaled by such service, upon affidavit and due proof thereof made to the Commissioner of Agriculture, and approved by the Board of Control, on such forms prescribed by the Com-

missioner of Agriculture. . . ." (Section
7, paragraph 3, H.B. 779).

Prior to the enactment of House Bill No. 12, at
the First Called Session of the Forty-fifth Legislature,
the State had been operating under the policy of having
refunds made by the Commissioner of Agriculture, said re-
funds thereby being an obligation of the State. Upon the
passage of House Bill No. 12, however, (which Act of the
Legislature became effective on September 24, 1937) the
policy of the State was changed, in that, by virtue of
the provisions of House Bill No. 12, from and after the
effective date of such Act the Commissioner of Agricul-
ture was directed and authorized to distribute throughout
the State of Texas, on a lease basis, the jacks and stal-
lions owned by the State of Texas, and to turn such of
the animals as it was unable to place on a lease basis
over to the State Board of Control, who were required to
dispose of the same to the best interest of the State.
By virtue of the provisions of House Bill No. 12, it
was expressly stipulated that the Commissioner of Agri-
culture should enter into lease contracts with keepers
or caretakers, said contracts to provide that the keeper
or caretaker should not make a service charge of more than
$10.00 for each foal, and further providing that the care-
taker or keeper should be personally liable for all refunds
in guaranteeing a foal, and that in no event should the
State of Texas be liable, directly or indirectly, for such
refunds.

The Act provided that the keeper or caretaker,
for rendering the services provided in the Act, should re-
ceive as his only compensation any sum or sums derived from
breeding fees for the services of the animal leased to him.

Section 4 of House Bill No. 12 provides, in part,
as follows:

"All moneys now on hand and accru-
ing to the jack and stallion account un-
der H.B. 779, Acts of the Forty-fourth
Legislature, Regular Session, and amended
by House Bill 8, Chapter 495, Forty-fourth
Legislature, Third Called Session, are
hereby transferred to the special Jack and
Stallion Fund to be used by the Commission-
er of Agriculture for making refunds on
breedings heretofore reported in conform-
ity with refunding provisions of House Bill

779, Acts of the Regular Session of the
Forty-fourth Legislature. . . "

The last clause of the second paragraph of Section 4 of House Bill No. 12 provides as follows:

". . . providing, however, that no refunds of breeding fees shall extend beyond January 1, 1938."

In construing House Bill No. 12, it must be borne in mind that, by virtue of the provisions of House Bill No. 779, the State of Texas made the provisions thereof regarding a refund of the breeding fee a part of each breeding contract entered into by and between the Department of Agriculture and the citizens of the State of Texas. In other words, it was made a part of each breeding contract entered into under the provisions of House Bill No. 779, that, in the event the breeding failed to produce a foal, the State of Texas, by and through the Department of Agriculture, upon due proof being made of that fact, would refund the breeding fee. It must also be remembered that until September 24, 1937, the provisions of House Bill No. 779 were in full force and effect, and such provision was necessarily incorporated in each and every contract for breeding entered into pursuant to House Bill No. 779 by the Department of Agriculture.

As the period of September 24, 1937, to January 1, 1938, was only four months, it was impossible for citizens having contracted prior to September 24, 1937, for services of jacks and stallions belonging to the Department of Agriculture, to know by January 1, 1938, whether the breeding would or would not produce a foal. Consequently, they could not conscientiously sign the affidavits and make the proof necessary to entitle them to the refund provided for in House Bill No. 779.

The State, when it enters into a contract with one of its citizens, is as much bound by that contract as is the citizen. By virtue of the provisions of Section 16, Article I, of the Constitution of Texas, and Section 10 of Article I of the Constitution of the United States, the State is forbidden to enact laws impairing the obligation of contracts; and it is clear that an Act which has a retroactive effect and impairs the obligation of a contract is unconstitutional. Farmers Life Insurance Company vs. Walters, 10 S.W. (2d) 698; Johnson vs. Smith, 246 S.W. 1013; Paschal vs. Cushman, 26 Tex. 74; 9 Tex. Jur., p. 541.

The courts will presume that the Legislature acted within the scope of its proper constitutional authority. When an Act of the Legislature is susceptible of two constructions, one which would render the Act constitutional, and the other which would render the Act unconstitutional, that construction which will uphold the Act as constitutional will be adopted.

It must be borne in mind that, effective as of September 24, 1937, House Bill No. 12 inaugurated a change of policy in the handling of jacks and stallions belonging to the Department of Agriculture. It was contemplated by House Bill No. 12 that, from and after the effective date of House Bill No. 12, the Commissioner of Agriculture should arrange for the leasing of the jacks and stallions in the manner hereinabove described. Necessarily, we believe, it was intended that a reasonable period of time be made available to the Commissioner of Agriculture to effect the changes called for by House Bill No. 12.

We are, therefore, impelled to the conclusion that the clause "provided, however, that no refunds of breeding fees shall extend beyond January 1, 1938", as used in House Bill No. 12, was intended by the Legislature to have the effect of allowing the Commissioner of Agriculture the limited period of time between September 24, 1937, and January 1, 1938, within which to arrange for the leasing of the animals, as contemplated by House Bill No. 12, and to permit him to continue to make breeding contracts with citizens of Texas, providing for refunds, so long as the animals were not leased under the provisions of House Bill No. 12, but in no event beyond January 1, 1938. To impute to the clause the broader meaning that no refunds of breeding fees should be made after January 1, 1938, upon breeding contracts entered into prior to the effective date of House Bill No. 12, would be to presume that the Legislature intended to enact an unconstitutional law.

We next pass to the question as to whether funds are available for the use of the Commissioner of Agriculture to make refunds to those who are entitled to them by virtue of the provisions of their valid contracts entered into by and between the Commissioner of Agriculture and themselves. It will be observed that Section 4 of House Bill No. 12, provides, in part, as follows:

"All moneys now on hand and accruing to the jack and stallion account under House Bill No. 779 . . . are hereby

transferred to the special Jack and Stal-
lion Fund to be used by the Commissioner
of Agriculture for making refunds on
breedings heretofore reported in conform-
ity with refunding provisions of House
Bill No. 779 . . . "

This language is sufficient to constitute an ap-
propriation of the special Jack and Stallion Fund for the
fiscal biennium ending August 31, 1939, for his use in
making refunds, in conformity with refunding provisions of
House Bill No. 779, on breedings "heretofore reported".
The special Jack and Stallion Fund is available to the Com-
missioner of Agriculture for making refunds on breedings
reported prior to the effective date of House Bill No. 12,
that is, on breedings reported prior to September 24, 1939.
In our opinion, on due proof thereof being made in conform-
ity with the refunding provisions of House Bill No. 779,
that the breeding did not produce a foal, the Commissioner
of Agriculture, so far as breedings reported prior to Sep-
tember 24, 1937, are concerned, may, prior to September 1,
1939, allow such refunds out of the special Jack and Stal-
lion Fund.

We find no appropriation, however, available for
the use of the Commissioner of Agriculture, for making re-
funds on breedings reported after September 24, 1937, and
we therefore conclude that although, as indicated above,
as to breedings had by virtue of a contract entered into
between the Commissioner of Agriculture and citizens of
Texas prior to January 1, 1938, such citizens, where the
breeding has failed to produce a foal, have lawful claims
against the State of Texas for such refunds, no money has
been appropriated by the Legislature for the purpose of
making such refunds. It is not to be assumed, however,
that the Legislature will fail to discharge obligations of
the State of Texas lawfully contracted for, and we, there-
fore, presume that subsequent sessions of the Legislature
will make due appropriation of moneys for the purpose of
allowing the Commissioner of Agriculture to refund breed-
ing fees to those who have shown themselves to be entitled
thereto under the provisions of House Bill No. 779, and of
House Bill No. 12, as above interpreted.

In our opinion, the obligation to make the re-
fund, under and by virtue of the contract, is an obliga-
tion of the State of Texas, and not the obligation of a
particular fund, and moneys to pay such refunds may be

appropriated either out of the Jack and Stallion Fund, or out of the General Fund. It was, of course, contemplated that these refunds should be made out of the Special Jack and Stallion Fund, and we presume that the Legislature, if that Fund be not exhausted, will appropriate from that Fund; but though the Special Jack and Stallion Fund may be exhausted, we conceive the obligation nonetheless rests upon the State of Texas to make such refunds, to the extent of the breeding fee collected under the contracts, for where a foal was not produced, the Special Jack and Stallion Fund has received the benefit, and thereby the State of Texas has received a benefit, which, under its contract, it is not entitled to retain.

We trust that the above will fully answer your questions.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By R. W. FAIRCHILD (Sgd.)
Richard W. Fairchild
Assistant

RWF:FG